# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 14, 2024　　　　Decided August 9, 2024

No. 23-5128

CATHERINE JOHNSON, ET AL.,
APPELLANTS

v.

XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS SECRETARY
OF HEALTH AND HUMAN SERVICES,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-03024)

*Alice Bers* argued the cause for appellants. With her on the briefs was *Wey-Wey Kwok*.

*Steven H. Hazel*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Alisa B. Klein*, Attorney, *Samuel R. Bagenstos*, General Counsel, U.S. Department of Health and Human Services, *Janice L. Hoffman*, Associate General Counsel, and *Susan Maxson Lyons*, Deputy Associate General Counsel for Litigation.

2

Before: SRINIVASAN, *Chief Judge*, RAO and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: The lead plaintiffs in this case are Medicare beneficiaries with chronic illnesses who depend on the services of home health aides. Although these services are generally covered by Medicare, the plaintiffs allege that Medicare-enrolled providers have refused to provide them in-home care or offered fewer services than they were entitled to. They attribute this problem to the policies and priorities of the Secretary of Health and Human Services, and they sued to compel systemwide reforms. Because the plaintiffs lack Article III standing to bring such claims, we affirm the district court's dismissal.

I.

A.

Medicare covers home health aides for homebound beneficiaries who need assistance with personal and medical care. 42 U.S.C. §§ 1395k(a)(2)(A), 1395x(m). Home health aides help patients with bathing, dressing, grooming, and taking medications, and they are generally employed through health care providers known as home health agencies ("HHAs").

HHAs are generally free to decide whether to serve Medicare beneficiaries. A beneficiary "may obtain health services from any [qualifying HHA] … *if* such institution … undertakes to provide him such services." *Id.* § 1395a(a) (emphasis added). To enroll in Medicare and receive Medicare payments, HHAs must satisfy conditions of participation, including meeting certain standards of care for the patients they serve. *See id.* § 1395bbb(a). HHAs may not

3

discriminate against patients based on disability. 29 U.S.C. § 794(a); 42 C.F.R. § 489.10(b)(2).

The Secretary administers the home health benefit and enforces the conditions of participation, including through regular audits of Medicare-enrolled HHAs. *See* 42 U.S.C. § 1395bbb(b), (c)(2)(A). He must prevent disability discrimination in the implementation of Medicare and "administer programs and activities in the most integrated setting appropriate to the needs of" disabled beneficiaries. 45 C.F.R. § 85.21(a), (d). The Secretary also must collect and publish data about Medicare-enrolled HHAs. One of those initiatives is the "Quality of Patient Care Star Rating" system, which assigns HHAs a star rating based on seven metrics, five of which focus on patient improvement. These ratings are published online.

B.

Plaintiffs Catherine Johnson and Cara Bunnell are Medicare beneficiaries who suffer from multiple sclerosis and require the services of home health aides.[1] Johnson alleges that her Medicare-enrolled HHA stopped providing her in-home service in 2021, and she has struggled to find an agency that would accept her as a patient ever since. Although some providers accepted her for short periods, they purportedly offered her fewer services than she was entitled to under Medicare, forcing Johnson to pay for additional care out of pocket. Bunnell has faced similar difficulties. Her Medicare-enrolled HHA stopped providing in-home services in 2022 after a benefits dispute. She now pays out of pocket for these services.

---

[1] On an appeal from the grant of a motion to dismiss, we accept the plaintiffs' well-pleaded factual allegations as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

4

These two plaintiffs are joined by the National Multiple Sclerosis Society and Team Gleason. Both organizations advocate for and assist individuals with chronic illnesses. They contend the patients they serve struggle to find HHAs that will provide Medicare-covered home health services, and so the organizations pay for private home health aides for those who cannot afford it. The plaintiffs sued the Secretary and sought to represent a class of chronically ill and disabled Medicare beneficiaries who had similarly been unable to find Medicare-covered home health services.

The plaintiffs bring two groups of claims. First, they allege the Secretary is violating the Medicare statute and regulations by insufficiently enforcing the conditions of participation on HHAs and unlawfully implementing the home health benefit. The plaintiffs claim that Medicare-enrolled HHAs flout the conditions of participation by underserving the chronically ill and that the Secretary is not doing enough to curb these violations. Moreover, the plaintiffs maintain that many of the Secretary's policies and practices contribute to the shortage of home health services available to Medicare beneficiaries.

Second, the plaintiffs claim the Secretary is violating the ban on disability discrimination. Because many HHAs refuse to accept or adequately care for Medicare patients, some patients are forced into nursing homes or other institutionalized care. The plaintiffs insist this violates the mandate to ensure health care is provided to individuals in the most integrated setting appropriate to their needs.

Based on these alleged violations, the plaintiffs request both a declaratory judgment and broad forms of injunctive relief. They seek to enjoin the Secretary to "[e]nsure that class members who … qualify for Medicare-covered home health aide services have reasonable access to the … services authorized by the Medicare statute and regulations." The

5

proposed injunction also demands stricter enforcement of the conditions of participation and policy reforms to the Secretary's auditing, payment, and quality rating systems.

The district court dismissed the plaintiffs' complaint for lack of Article III standing because they "failed to plausibly allege" that "their requested relief would redress any harm." *Johnson v. Becerra*, 668 F. Supp. 3d 14, 20 (D.D.C. 2023). The court found that the plaintiffs' alleged injuries were caused by private HHAs not before the court and that they failed to demonstrate it was likely that enjoining the Secretary would cause the HHAs to change their behavior. *Id.* at 21. Moreover, the plaintiffs described their requested relief at such a "high level of generality" that it was effectively "a generalized injunction to obey the law." *Id.* (cleaned up). Because the court was "unsure of what Plaintiffs [were] asking it to order the Secretary to do," it could not "evaluate whether granting that relief would" have a meaningful effect on the choices of private HHAs to accept chronically ill Medicare patients. *Id.* at 22. Without sufficient allegations supporting redressability, the district court concluded the plaintiffs lacked standing.

The plaintiffs timely appealed. We review the district court's dismissal for lack of subject matter jurisdiction *de novo*. *Jibril v. Mayorkas*, 101 F.4th 857, 865 (D.C. Cir. 2024).

II.

The plaintiffs seek a sweeping and multi-faceted injunction directing the Secretary to better enforce the conditions on Medicare participation and adopt new policies for administering the home health benefit. The plaintiffs suggest such an injunction would remedy their alleged injuries—namely, the denial of Medicare-covered home health services and the financial injury of having to pay for such services out of pocket. We assume without deciding that these are injuries in fact but conclude that the plaintiffs have failed

6

to allege redressability. The plaintiffs seek judicial reordering of the enforcement and policy priorities of the Secretary, but granting such relief is generally not within the power of the Article III courts. The plaintiffs' injuries stem from private HHAs that have made independent choices not to serve chronically ill patients. And the plaintiffs have offered only speculation that the relief they seek from the Secretary will redress their harms by prompting private health providers to expand their services. Thus, the plaintiffs have failed to establish standing to bring this suit.

A.

To maintain an action in federal court, the plaintiffs must show they have suffered an "injury in fact," "fairly traceable to the challenged action of the defendant," and it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable [judicial] decision."[2] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). It is "substantially more difficult" for plaintiffs to establish standing if they challenge government action (or inaction) in order to remedy an injury caused by a third party. *Id.* at 562 (cleaned up). A federal court generally "cannot redress injury that results from the independent action of some third party not before the court." *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (cleaned up). "[M]ere unadorned speculation as to the

---

[2] The organizational plaintiffs assert standing based on the resources they expend helping chronically ill patients obtain home health services. Like the individual plaintiffs, the organizations' financial injury stems from HHAs denying covered home health services to Medicare beneficiaries, and they rely on the same theories of causation and redressability. We do not assess the separate requirements of organizational standing because the organizations have failed to allege redressability for the same reasons as the individual plaintiffs.

existence of a relationship between the challenged government action and the third-party conduct will not suffice to invoke the federal judicial power." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (cleaned up).

When plaintiffs sue the government in order to change third-party behavior, they bear the burden of showing that "agency action is at least a substantial factor motivating the third parties' actions." *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001) (cleaned up). And there must be "little doubt as to … the likelihood of redress." *Nat'l Wrestling*, 366 F.3d at 941. This is a significant barrier—courts have routinely rejected suits for injunctive relief that are directed against executive agencies but that seek to change the behavior of third parties.

In *Simon v. Eastern Kentucky Welfare Rights Organization*, for instance, low-income patients sued the IRS because tax exempt hospitals had chosen not to provide them care. 426 U.S. 26, 28–29, 32–33 (1976). The plaintiffs argued that an IRS ruling on the tax exemption encouraged the hospitals not to provide certain services to the indigent, and so a judicial order invalidating that ruling would encourage the provision of those services. *Id.* at 42. But the hospitals were "independent" actors with many reasons to deny service to low-income patients, and so the Supreme Court found it "speculative" that "the desired exercise of the court's remedial powers … would result in the availability … of [hospital] services." *Id.* at 42–43. Similarly, in *National Wrestling*, we held the plaintiffs lacked standing to challenge Title IX guidance documents that allegedly pressured schools to eliminate men's wrestling programs. 366 F.3d at 937. We explained there were other incentives for schools to make the same choices, and so an allegation that the plaintiffs would have "'better odds' of retaining the[] desired wrestling

8

programs" in the absence of the guidance documents was not enough to show that vacating the guidance would redress the alleged harm. *Id.* at 940, 942. At bottom, it is difficult for plaintiffs to prove "the causation and redressability requirements" of standing when they "challenge[] only an Executive Branch decision not to impose costs or penalties upon some third party." *Branton v. FCC*, 993 F.2d 906, 910–11 (D.C. Cir. 1993).

These well-established principles reflect the separation of powers concerns at the heart of our standing doctrine. "The Constitution … assigns to the Executive Branch, and not to the Judicial Branch, the duty to 'take Care that the Laws be faithfully executed.'" *Allen v. Wright*, 468 U.S. 737, 761 (1984) (quoting U.S. CONST. art. II, § 3). Article III courts are not "continuing monitors of the wisdom and soundness of Executive action." *Id.* at 760 (cleaned up). Thus, federal courts lack jurisdiction over "suits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations." *Id.* at 759. These concerns are especially acute here, where the plaintiffs have sued the Secretary over his alleged failure to enforce and administer the laws in a particular manner.

B.

For the purposes of assessing standing, the requested injunctive relief can be divided into two categories. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("[P]laintiffs must demonstrate standing for … each form of relief that they seek."). Plaintiffs seek a directive from the court instructing the Secretary to: (1) increase enforcement of the regulations applicable to HHAs; and (2) change the policies and programs administering home health benefits. The

9

plaintiffs have failed to plausibly allege standing to seek either form of relief.

1.

First, the plaintiffs request an injunction "directing the Secretary to … [m]eaningfully enforce" the conditions for HHAs to participate in Medicare. Although the Secretary regularly audits HHAs for compliance with the applicable regulations, the plaintiffs want the Secretary to focus more auditing and enforcement resources on HHAs that provide inadequate service to the chronically ill and disabled.

Plaintiffs' challenge to the enforcement policies and priorities of the Secretary runs into the basic rule that "private persons … have no judicially cognizable interest in procuring enforcement of the … laws" against third parties. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984). The plaintiffs never specify what constitutes "meaningful enforcement," but regardless of whether they want stiffer penalties or more enforcement actions against particular offenders, they lack standing to compel the Secretary to take such steps.

The plaintiffs have failed to allege redressability with respect to their claims for stricter enforcement in part because they have failed to allege a causal link between enforcement priorities and their injuries. When a plaintiff challenges government action in order to redress an injury from a third party, our court has required "formidable evidence" of causation. *See Nat'l Wrestling*, 366 F.3d at 942 (cleaned up). Yet the plaintiffs put forward no evidence of causation, much less formidable evidence. They allege only that HHAs have refused to accept them or offered them insufficient covered services, and they make the conclusory allegation that this is the result of the Secretary's failure to enforce the conditions of participation. But there is no condition that Medicare-enrolled HHAs must serve all Medicare beneficiaries. The relevant

10

conditions apply only once an HHA has undertaken to provide service. It is therefore "purely speculative whether the denials of service specified in the complaint fairly can be traced to" the Secretary's enforcement practices. *Simon*, 426 U.S. at 42–43.

The causation and redressability requirements of standing are "closely related[,] like two sides of a coin. … If the challenged conduct is at best an indirect or contributing cause of the plaintiff's injury[,] … the plaintiff faces an uphill climb in pleading and proving redressability." *West v. Lynch*, 845 F.3d 1228, 1235–36 (D.C. Cir. 2017) (cleaned up). Plaintiffs argue their claims are redressable because, if the Secretary "meaningfully enforce[d]" the conditions of participation, disabled and chronically ill patients would be more likely to obtain Medicare-covered home health services. But these pleadings are insufficient because HHAs are free to choose whether to accept a patient. *See* 42 U.S.C. § 1395a(a). The plaintiffs offer no reason for us to infer that greater enforcement of the conditions of participation would cause HHAs already serving Medicare beneficiaries to expand their services or would result in other HHAs undertaking to serve Medicare beneficiaries.

There are many economic and practical reasons why an HHA might not provide services to a chronically ill Medicare beneficiary. For instance, the complaint recognizes that rates of in-home care have been steadily declining for the past 20 years. In both their complaint and at oral argument, the plaintiffs indicated that private health insurers might pay more than Medicare. Given the various regulatory and private market forces at work, we cannot plausibly infer that HHAs would choose to provide services to these plaintiffs if the Secretary expanded the scope or vigor of his enforcement efforts. "When conjecture is necessary, redressability is lacking." *West*, 845 F.3d at 1237.

11

2.

Second, the plaintiffs request an injunction ordering the Secretary to devise new policies and strategies for accomplishing the goals in the Medicare statutes. The plaintiffs seek a judicial directive to the Secretary to regulate to "[e]nsure that" qualified beneficiaries "have reasonable access to … home health aide services" and are not discriminated against or unnecessarily institutionalized. For example, the plaintiffs ask the court to order the Secretary to change his "payment methods and criteria" and reform "quality measurement and/or rating criteria" to "effectuate reasonable access to … Medicare-covered aide services."

Notably, the plaintiffs do not seek to enjoin a particular unlawful action by the Secretary. They also do not seek to compel the Secretary to guarantee covered home health services for particular patients. Nor could they. As already noted, private HHAs may choose whether to accept a patient. *See* 42 U.S.C. § 1395a(a). To remedy the shortage of services, the plaintiffs instead request a court order instructing the Secretary to make systemic reforms to his administration of the home health benefit. But the Supreme Court has always "rejected claims of standing predicated on the right, possessed by every citizen, to require that the Government be administered according to law." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 482–83 (1982) (cleaned up). In a properly brought case, courts may review the lawfulness of executive action, but the courts have no constitutional authority to direct executive agencies in their policymaking functions. Congress conferred regulatory authority over the home health benefit to the Secretary, not the Article III courts.

Moreover, the requested relief is woefully underspecified. Although the plaintiffs claim that the Secretary's payment

12

policies, audits, and rating system contribute to health care shortages, they never identify what reforms are necessary to fix the problem. When pressed in the district court, the plaintiffs asked for "reasonable modifications." Without more detail, it is "purely speculative" whether an injunction instructing the Secretary to better administer the law will cause HHAs to accept more chronically ill Medicare patients. *Simon*, 426 U.S. at 42.

The closest the plaintiffs come to specifying some relief is proposing the Secretary revise his Star Rating system so that it does not discourage HHAs from accepting patients with chronic illnesses. But the plaintiffs fail to connect the ratings to their injuries. We have no basis to infer that a directive to alter the rating system would improve the plaintiffs' access to covered home health services. Even if different rating criteria could, in theory, influence HHA behavior, "a quest for ill-defined 'better odds' is not close to what is required to satisfy the redressability prong of Article III."[3] *Nat'l Wrestling*, 366 F.3d at 939.

In sum, we cannot infer from the facts here that the Secretary's policies cause HHAs to reject or underserve chronically ill Medicare patients. In the absence of any plausible causal link, plaintiffs have failed to demonstrate that their proposed injunction would redress their injuries by prompting HHAs to provide the services they seek.

---

[3] The plaintiffs also request an injunction requiring the Secretary to better train and educate Medicare auditors and HHAs on the requirements of the Medicare statutes. But as with the other forms of requested relief, the plaintiffs fail to allege how training failures led to the denial of home health benefits or how training improvements would redress their injuries.

13

C.

Plaintiffs raise several additional arguments, but none succeeds in establishing the necessary elements of standing.

First, plaintiffs maintain the causal influence of the Secretary's policies and the effectiveness of various reforms are questions of fact that cannot be resolved on a motion to dismiss. If there is uncertainty about causation or redressability, they contend, it should be resolved in the plaintiffs' favor.

Even at the motion to dismiss stage, however, the plaintiffs bear "the burden of … adduc[ing] facts showing that [third-party] choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* at 938 (quoting *Lujan*, 504 U.S. at 562). The plaintiffs admit that complex factors contribute to an HHA's decision not to offer covered home health services. Even if it is possible that reforms to payment policies or the Star Rating system would affect an HHA's decision to provide care to more Medicare beneficiaries, "that possibility is sheer speculation" and depends on unsubstantiated assumptions about how private HHAs would respond to changes in government policy. *See Crete Carrier Corp. v. EPA*, 363 F.3d 490, 494 (D.C. Cir. 2004). While the burden to establish Article III standing is easier at the pleading stage, the plaintiffs here have failed to meet even that burden.

Second, the plaintiffs argue they have adequately alleged redressability because the Secretary has a statutory obligation to enforce the requirements of the Medicare statutes. That makes this case different from *Simon* or its progeny, say the plaintiffs, because the Secretary has a "formal legal relationship" with Medicare-enrolled HHAs and an "affirmative duty" to ensure that HHAs follow the conditions of participation and the nondiscrimination mandate. In

14

assessing whether an injunction against the government would change third-party behavior in a way that redresses the plaintiffs' injuries, we have never exclusively relied on the formality of the legal relationship between the government and the third party.[4] Rather, the question is whether the plaintiffs have "allege[d] specific, concrete facts demonstrating that … [they] personally would benefit in a tangible way from the court's intervention." *Warth v. Seldin*, 422 U.S. 490, 508 (1975).

Relatedly, the plaintiffs contend that because HHAs are heavily regulated, the Secretary possesses the coercive power to redress the plaintiffs' harms. According to this logic, the Secretary administers the "comprehensive legal regime under which HHAs operate," and so he can purportedly compel or incentivize the HHAs to make different decisions. The plaintiffs seem to suggest that the more authority Congress confers on an agency, the more likely it is a plaintiff would have standing to order reform to the agency's administrative policies.

But the unremarkable fact that an agency has substantial regulatory and enforcement tools does not bolster the authority

---

[4] Our decision in *National Parks Conservation Association v. Manson*, on which the plaintiffs rely, is not to the contrary. 414 F.3d 1 (D.C. Cir. 2005). In *Manson*, the plaintiffs challenged the Department of the Interior's decision to withdraw an environmental assessment of a proposed power plant. We held the plaintiffs had standing even though the state permitting agency—which was not a party to the lawsuit—had to approve the project. We emphasized that it was substantially likely the withdrawal affected the state's decision. *Id.* at 6–7. Not only was there a "formal legal relationship" between state requirements for permitting and the federal assessment, Interior's "withdrawal of its impact letter was *virtually dispositive* of the state permitting decision." *Id.* at 6 (emphasis added).

15

of the federal courts to direct the policy priorities of an agency. Many of our standing cases involve plaintiffs seeking to change the actions of heavily regulated private parties by enjoining the Executive Branch. In each of these cases, we have maintained the importance of demonstrating a substantial likelihood of redressability. *See, e.g.*, *Chamber of Commerce v. EPA*, 642 F.3d 192, 201 (D.C. Cir. 2011); *Nat'l Wrestling*, 366 F.3d at 938; *Branton*, 993 F.2d at 911. In fact, "[w]hen plaintiffs' asserted injury stems from the government's allegedly unlawful … lack of regulation[] of someone else, the fairly traceable and redressability prongs of standing analysis require more exacting scrutiny." *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 416 (D.C. Cir. 1994) (cleaned up).

Plaintiffs raise novel arguments, but they do not justify loosening the requirements of standing. Allowing a plaintiff to demonstrate redressability by pointing to an agency's substantial regulatory authority would dramatically expand Article III standing in a manner inconsistent with the Constitution and our precedents.

\* \* \*

Suffering from a shortage of home health care services, the plaintiffs ask this court to order the Secretary to change his enforcement and other policies. The shortages, however, are a result of choices made by private home health care agencies. Because the plaintiffs have failed to demonstrate their injuries are redressable by their requested injunctive relief, they lack Article III standing. We therefore affirm the district court's dismissal for lack of jurisdiction.

*So ordered.*